IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ALEXSAM, INC. | § | |
|       Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 2:07-cv-288 |
| HUMANA INC., | § | |
| | § | |
|       Defendant. | § | |
| | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER**

After considering the submissions and the arguments of counsel, the Court issues the following order concerning the claim construction issues:

**I. Introduction**

Plaintiff Alexsam, Inc. ("Alexsam") filed this lawsuit against defendants Evolution Benefits, Inc. and Humana, Inc. ("Humana") alleging infringement of the U.S. Patent No. 6,000,608 ("the '608 Patent"). The '608 patent has been previously litigated before this Court, in *Alexsam, Inc. v. Datastream Card Services Limited*, Cause No. 2:03-CV-337. In an order dated June 10, 2005 (Cause No. 2:03-CV-337, Dkt. No. 199, hereinafter, "Datastream Markman Order"), this Court construed a total of 35 limitations of the asserted patents. The parties have agreed to adopt the Court's constructions from the Datastream Markman Order for some of the terms at issue in this case. Alexsam, however, requests the Court to reconsider its prior claim construction with regard to one of the remaining terms in dispute.

## II. Background of the Technology

The '608 patent is entitled "multifunction card system" and describes a system accessible from retail point-of-sale ("POS") terminals. According to the Alexsam, the patented multifunction card system allows for the activation of a variety of cards and the use of gift, loyalty, medical information, and debit/medical services cards. The '608 patent explains that at the point of sale, a retailer has an existing POS device, such as a card swipe machine, cash register, or computer terminal. A gift card, loyalty card, or phone card has a magnetic strip, similar to a credit or debit card, with a card number encoded on the strip. The card number includes a bank identification number ("BIN") which the retailer's POS device is able to read. The novel aspect of the invention is the use of the BIN in connection with the card number to take advantage of existing POS devices. At the time of the application, existing POS terminals were pre-programmed to read bank identification numbers associated with two card issuing institutions. By incorporating a BIN into the card number, the inventor claims to have created a system that did not require the retailers to modify and pre-program their existing POS terminals.

The system allows the retail clerk to activate the cards at the point of sale and route the information to the processing hub which creates an account. When a user makes a card purchase, the system routes the data to a processing hub which compares the purchase price to the balance and issues an approval code back to the retailer and decrements the balance or declines the transaction if there is an insufficient balance on the card. The system also enables a user to re-charge the account balances. Finally, the system enables the use of "smart cards" which can perform multiple functions (such as a gift certificate coupled with a pre-paid phone card).

One of the invention's primary purposes is to solve the problem of a "closed loop" system that was being used for phone cards at that time of the invention. The closed loop system required that a dedicated POS be installed in each retail location. By encoding a bank identification number into his cards, the inventor, Robert Dorf, was able make his cards work with existing standard retail POS devices without any need for modification to the POS. In allowing the claims for the '608 patent, the Examiner forced the applicant to include both these limitations – the BIN and an unmodified POS – in the allowed claims. Aside from the invention relating to phone cards, Dorf claimed related inventions, namely, gift certificate cards, loyalty cards and debit/medical cards that could work with the same system.

In this case, Alexsam has asserted claims 32 and 33 of the '608 patent against Humana. Those claims involve a system that relates to debit and medical services cards along with the associated debit and medical-related databases. The debit/medical card is associated with an account that maintains medical funds, such as a medical savings account, and is used to authorize financial transactions. The same card may also provide access to medical information such as Medicare information for the patient or the patient's medical history.

The abstract of the '608 patent states:

> Disclosed is a multifunction card system which provides a multifunction card capable of serving as a prepaid phone card, a debit card, a loyalty card, and a medical information card. Each card has an identification number comprising a bank identification number which assists in establishing communications links. The card system can be accessed from any existing point-of-sale (POS) device. The POS device treats the card as a credit or debit card and routes transaction data to a processing hub using the banking system. The processing hub coordinates the various databases corresponding to the various functions of the card.

'608 Patent, at Abstract.

Claim 32 is exemplary of the '608 patent as a whole and reads as follows:

32. A multifunction card system comprising:
   a. at least one debit/medical services card having a unique identification number encoded on it comprising a bank identification number approved by the American Banking Association for use in a banking network;
   b. a transaction processor receiving card data from an unmodified existing standard point-of-sale device, said card data including a unique identification number;
   c. a processing hub receiving directly or indirectly said card data from said transaction processor; and
   d. said processing hub accessing a first database when the card functions as a debit card and said processing hub accessing a second database when the card functions as a medical card.

'608 Patent at Cl. 32.

### III. General Principles Governing Claim Construction

"A claim in a patent provides the metes and bounds of the right which the patent confers on the patentee to exclude others from making, using or selling the protected invention." *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). Claim construction is an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

To ascertain the meaning of claims, the court looks to three primary sources: the claims, the specification, and the prosecution history. *Markman*, 52 F.3d at 979. Under the patent law, the specification must contain a written description of the invention that enables one of ordinary skill in the art to make and use the invention. A patent's claims must be read in view of the specification, of which they are a part. *Id*. For claim construction purposes, the description may act as a sort of dictionary, which explains the invention and may define terms used in the claims. *Id*. "One purpose for examining the specification is to determine if the patentee has limited the scope of the claims." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 882 (Fed. Cir.

2000).

Nonetheless, it is the function of the claims, not the specification, to set forth the limits of the patentee's claims. Otherwise, there would be no need for claims. *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc). The patentee is free to be his own lexicographer, but any special definition given to a word must be clearly set forth in the specification. *Intellicall, Inc. v. Phonometrics*, 952 F.2d 1384, 1388 (Fed. Cir. 1992). And, although the specification may indicate that certain embodiments are preferred, particular embodiments appearing in the specification will not be read into the claims when the claim language is broader than the embodiments. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994).

This court's claim construction decision must be informed by the Federal Circuit's decision in *Phillips v. AWH Corporation*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). In *Phillips*, the court set forth several guideposts that courts should follow when construing claims. In particular, the court reiterated that "the *claims* of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d at 1312 (emphasis added) (*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To that end, the words used in a claim are generally given their ordinary and customary meaning. *Id*. The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id*. at 1313. This principle of patent law flows naturally from the recognition that inventors are usually persons who are skilled in the field of the invention. The patent is addressed to and intended to be read by others skilled in the

5

particular art. *Id*.

The primacy of claim terms notwithstanding, *Phillips* made clear that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. Although the claims themselves may provide guidance as to the meaning of particular terms, those terms are part of "a fully integrated written instrument." *Id*. at 1315 (*quoting Markman*, 52 F.3d at 978). Thus, the *Phillips* court emphasized the specification as being the primary basis for construing the claims. *Id*. at 1314-17. As the Supreme Court stated long ago, "in case of doubt or ambiguity it is proper in all cases to refer back to the descriptive portions of the specification to aid in solving the doubt or in ascertaining the true intent and meaning of the language employed in the claims." *Bates v. Coe*, 98 U.S. 31, 38 (1878). In addressing the role of the specification, the *Phillips* court quoted with approval its earlier observations from *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998):

> Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.

Consequently, *Phillips* emphasized the important role the specification plays in the claim construction process.

The prosecution history also continues to play an important role in claim interpretation. The prosecution history helps to demonstrate how the inventor and the PTO understood the patent. *Phillips*, 415 F.3d at 1317. Because the file history, however, "represents an ongoing

6

negotiation between the PTO and the applicant," it may lack the clarity of the specification and thus be less useful in claim construction proceedings. *Id*. Nevertheless, the prosecution history is intrinsic evidence. That evidence is relevant to the determination of how the inventor understood the invention and whether the inventor limited the invention during prosecution by narrowing the scope of the claims.

*Phillips* rejected any claim construction approach that sacrificed the intrinsic record in favor of extrinsic evidence, such as dictionary definitions or expert testimony. The *en banc* court condemned the suggestion made by *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that a court should discern the ordinary meaning of the claim terms (through dictionaries or otherwise) before resorting to the specification for certain limited purposes. *Id*. at 1319-24. The approach suggested by *Texas Digital*–the assignment of a limited role to the specification–was rejected as inconsistent with decisions holding the specification to be the best guide to the meaning of a disputed term. *Id*. at 1320-21. According to *Phillips*, reliance on dictionary definitions at the expense of the specification had the effect of "focus[ing] the inquiry on the abstract meaning of words rather than on the meaning of the claim terms within the context of the patent." *Id*. at 1321. *Phillips* emphasized that the patent system is based on the proposition that the claims cover only the invented subject matter. *Id.* What is described in the claims flows from the statutory requirement imposed on the patentee to describe and particularly claim what he or she has invented. *Id.* The definitions found in dictionaries, however, often flow from the editors' objective of assembling all of the possible definitions for a word. *Id*. at 1321-22.

*Phillips* does not preclude all uses of dictionaries in claim construction proceedings.

Instead, the court assigned dictionaries a role subordinate to the intrinsic record. In doing so, the court emphasized that claim construction issues are not resolved by any magic formula. The court did not impose any particular sequence of steps for a court to follow when it considers disputed claim language. *Id.* at 1323-25. Rather, *Phillips* held that a court must attach the appropriate weight to the intrinsic sources offered in support of a proposed claim construction, bearing in mind the general rule that the claims measure the scope of the patent grant.

## IV. Agreed Constructions

| Claim Language | Alexsam's Proposed Construction | Humana's Proposed Construction |
|---|---|---|
| *"transaction processor"* | a computer, other than processing hub, that facilitates the card transaction and that is remote from the unmodified existing standard point-of-sale device | |
| *"multifunction card system"* | a card system that can serve a number of functions | |
| *"bank identification number approved by the AmericanBanking Association for use in a banking network"* | a numeric code which identifies a card issuing financial institution and that is sanctioned by the American Banker's Association | |
| *"encoded"* | placed into a code | |
| *"unique identification number"* | no construction necessary | |
| *"unmodified existing standard point-of-sale device"* | a terminal for making purchases of the type in use as of July 10, 1997, that has not been reprogrammed, customized, or otherwise altered with respect to its software or hardware for use in the card system | |

## V. Terms in Dispute

### 1. debit/medical services card (Claim 32)

| Claim Language | Alexsam's Proposed Construction | Humana's Proposed Construction |
|---|---|---|
| *"debit/medical services card"* | a card that can function as both a debit card and a medical services card | a card that can be used as both a debit card and as a medical card |

The dispute between the parties concerning the construction of this term centers around

the meaning of "medical services." Alexsam argues that Humana seeks to limit it to the use of the card only to obtain medical information. Alexsam contends that the patent discloses other examples of medical services that can be provided by the card. *See, e.g.* '608 patent, 10:40-47 ("In order to allow a cardholder to keep track of medical savings accounts or various other means for paying for medical services (e.g., Medicare), the system 108 also allows access to a database which maintains the medical funds for the cardholder."). Alexsam also makes a claim differentiation argument, pointing to other claims where the patentee repeatedly used "medical information card" rather than a "medical services card." *See id.*, Cl. 14-15, 56, 58-59.

Humana points out that the specification discloses a need for a medical information card that allows medical providers, such as those in an emergency room, to access medical history information of a cardholder by swiping the card through a POS device. '608 patent, col. 10, ll. 6-20. Humana argues that "medical card" function of Claim 32 must be "medical information" because it is the only type of "non-debit" medical services/card disclosed in the '608 patent.[1] The Court disagrees. Contrary to Humana's argument, the specification of the '608 patent does not "repeatedly reinforce" the usage of the term "medical services" to mean "medical information" that would relate only to a patient's medical history. *Cf. On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006). The Court finds sufficient support in the specification to adopt plaintiff's proposed construction.

---

[1] Humana points to the inventor's deposition testimony stating that a "medical savings account" is a debit card. *See* Defendant's Response, Ex. J, at 209, ll. 14 - 18. The Court, however, does not rely on inventor testimony for claim construction purposes. *See Howmedica Osteonics Corp. v. Wright Med Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008).

The Court further finds Humana's proposed phrase "can be used" is less appropriate for the construction of this term. The Court notes that the patent consistently describes the cards as capable of performing "functions."

A "debit/medical services card" is, therefore, construed as "a card that can function as both a debit card and a medical services card."

### 2. medical card (Claim 32)

| Claim Language | Alexsam's Proposed Construction | Humana's Proposed Construction |
| --- | --- | --- |
| *"medical card"* | a card that allows access to a medical-related database | a card issued to a patient that allows access to and retrieval of the patient's medical history information from a remote location |

The dispute here is related to the scope of the "medical database" that may be used with the medical card of the patented multifunction system and the location from which data may be retrieved.

Alexsam argues that each card function is defined by the database it accesses. Therefore, it argues, the phrase "functions as a medical card" refers to the function of accessing any medical-related database. In response, Humana repeats its prior arguments, attempting to limit the scope of this term to retrieval of "medical history information." Further, Humana argues that the language "a card that allows access to a medical-related database" is vague because it is unclear what databases are in fact "related to medical."

Alexsam, in response, cites examples of medical-related databases as those containing data related to medical insurance or Medicare, medical eligibility requirements, and IRS requirements for medical services. Secondly, Alexsam argues that the scope of the claim is not

limited to retrieval of data from a remote location – that is simply an "exemplary embodiment" disclosed in the specification. *See* '608 patent, 10:10-12. Alexsam requests the Court not to limit this claim to a single example. *See Agfa Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006) (noting that the Federal Circuit has "repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claims to that depicted scope").

The Court finds that Alexam's proposed construction is too broad. However, the Court also disagrees with Humana that the patent claim is so narrow as to encompass only the patient's medical history information. Humana points to several places in the specification that disclose access to "medical information." In light of this disclosure, Humana argues that the Court should ignore the single instance of disclosure in the specification that suggests that the card may be used "to keep track of medical savings accounts or various other means for paying for medical services." *See* '608 patent, 10:40-47. More specifically, the specification discloses that the card may be used to access a Medicare database. *Id*. Given that a patient's Medicare account is neither a "debit" account nor a "medical history information" account, the Medicare database fails to fit into either of the two categories that Humana suggests would be encompassed by this claim. The Court refuses to read out an embodiment disclosed in the specification. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (noting that a construction which would result in excluding the preferred embodiment "is rarely, if ever, correct"). The Court finds that there is sufficient support in the specification to allow the scope of this claim term to extend more broadly to all databases that contain "medical information."

The Court construes this term as: "A card that allows access to a database containing medical information."

### 3. medical identification number (Claim 33)

| Claim Language | Alexsam's Proposed Construction | Humana's Proposed Construction |
|---|---|---|
| *"medical identification number"* | a number used for identification purposes associated with a record in a database containing medical-related data | a number on a patient's card that corresponds to a record containing the patient's medical history information |

On this term, the parties disagree as to what a medical database record entails. Because Humana seeks to limit the database to one containing only medical history information, it argues that the record being retrieved using a "medical identification number" has to be a patient's record containing medical history information. Here too, Humana argues that phrase "medical-related data" as proposed by Alexsam is too broad.

The specification does not recite the term "medical identification number." The only related disclosure is of an "identification number encoded on the patient's card" that is used to pull a record containing a patient's medical information stored in a medical information database. *See* '608 patent, 10:7–12. The Court has, however, construed the term "medical card" to include databases that contain "medical information." Furthermore, the claims allow for the use of single identification number that can be used to access different types of databases. *See, e.g.*, '608 patent, cl. 13. Therefore, it is inappropriate to limit the scope of this term to patient medical history information alone.

The Court construes this term consistent with the preceding one as "a number used for identification purposes associated with a record in a database containing medical information."

### 4.    card data (Claim 32)

| Claim Language | Alexsam's Proposed Construction | Humana's Proposed Construction |
|---|---|---|
| *"card data"* | no construction is needed. Alternatively, "information related to the card" | data contained on the card, including activation data encoded on the card |

Primarily, the parties dispute whether "activation data" needs to be encoded on the card. Alexsam seeks to broadly construe "card data" as any "data related to the card" that is used in the transactions being processed. In contradiction to the very term, Alexsam argues that "card data" includes even data that is not contained on the card, so long as it is *related* to the card.

Humana seeks to add a limitation of "activation data" being included on the card. Humana argues that activation of cards at POS terminals is a key aspect of the invention. *See* '608 patent, 2:15-18. Further, it argues that the "unique identification number" is the only card data relevant to activation, and the claim expressly includes this number as being part of "card data." *Id*., cl. 32. Furthermore, Humana argues that a scope disavowal by the inventor during prosecution of the '608 patent mandates the limitation. Humana points out that in overcoming the *Stimson*[2] prior art, the Applicant argued:

> Thus, the present invention recognizes, and claims, the unique advantage of providing a system which can be used flexibly with a variety of different encoded cards that include, as part of the information contained on the card, a unique identification number which includes a bank identification number approved by the ABA for use in a banking network, thus allowing the existing point of sale system in place at a retailer, and the existing banking network and existing bank processing hubs, to be used to activate or recharge phone cards, electronic gift certificates and other card types and functionality described and claimed in the instant application.

Amendment dated June 24, 1999, '608 patent prosecution history, at 11-12.

---

[2] Stimson et al., United States Patent No. 5,577,109.

Further, Humana notes that in the Notice of Allowability for the '608 patent claims, the Examiner stated that "the applicant discloses a multifunction card system which has means for receiving activation data from an unmodified point-of-sale device when the card is swiped through the point-of-sale device which is not found in the prior art of record." *See* Examiner's Notice of Allowability dated August, 5, 1999, 608 Patent Prosecution History. Therefore, Humana argues that POS activation was a basis for the Examiner's allowance of the '608 patent claims.

Alexsam's response is that Claim 32 is different from all other claims. Alexsam points out that Claim 32 and dependent claim 33 were never rejected over the *Stimson* prior art. The Examiner rejected these two claims over a different prior art, *Pritchard*,[3] and the disclaimers made in response to the Office Action that Humana relies upon, according to Alexsam, do not apply to these two claims. Alexsam's argument is that the Examiner did not reject claims 32 and 33 in light of *Stimson* because these claims did not involve activation, while all the other rejected claims did. Along the same lines, Alexsam argues that Claims 32 and 33 should be differentiated from claims that expressly include the activation data as part of the unique identification number. *See, e.g.*, '608 patent, cls. 1, 9, 16. The Court agrees. In construing claim terms the Court first looks to the claims themselves. *See Phillips*, 415 F.3d at 1312 ("the *claims* of a patent define the invention to which the patentee is entitled the right to exclude"). There is nothing in Claims 32 and 33 that requires activation. The Court is not persuaded Humana's argument that the Examiner's comments read an implied limitation into these claims. First, the prior art that the

---

[3] Pritchard et al., United States Patent No. 4,491,725.

examiner rejected these claims over, *Pritchard*, had nothing to do with activation. Secondly, even if the Court were to look to the argument that the patentee made to overcome the *Stimpson* prior art, the statement made by the patentee clearly includes "other card types and functionality described and claimed in the instant application." Similarly, the Court does not agree with Humana that every part of the Examiner's Notice of Allowability applies to every single claim allowed. *See* Notice of Allowability dated August, 5, 1999, '608 patent prosecution history. Moreover, "an examiner's statement cannot amend a claim." *See Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005).

"Card data" means "data contained on the card."

### 5.     processing hub (Claim 32)

| Claim Language | Alexsam's Proposed Construction | Humana's Proposed Construction |
|---|---|---|
| *"processing hub"* | a computer which provides frontend POS device management and message processing for card authorizations, activations, or other functions depending on the card or transaction type | a computer which provides front-end POS device management and message processing for card authorizations and activations |

The dispute between the parties concerning the construction of "processing hub" is whether the hub is capable of processing anything besides authorizations and activations. Defendant Humana asks the Court to retain its construction for this term from its Datastream Markman Order. In construing this term in that case, the Court had found that the '608 patent specification provided a definition of the "processing hub" as used in this invention. *See* Datastream Markman Order at 10. The Court, therefore, adopted the definition for this term as recited in the specification. *Id*. Humana argues that the Court's prior construction is also in line

with the prosecution history of the '608 patent where the applicant highlighted the ability of the system to be activated through existing POS devices.

Alexsam argues that the Court's prior construction was only appropriate to other claims of the patent; Claim 32 was not at issue in that case. Here too, Alexsam argues that Claims 32 and 33 are different and have nothing to do with activation. According to Alexsam, the Court's prior construction is inappropriate in this case because it does not account for the types of medical-related transactions and processing of "medical-related" data that claim 32 contemplates. As examples of other transactions that the hub can be used for, Alexsam points to sections of the specification that deal with medical information retrieval and adding loyalty data to a card. *See, e.g.*, '608 patent, 5:11-12, 10:13-14, 10:22-27. Because the Court agrees with Alexsam that Claims 32 and 33 do not involve activation, and these are the only claims asserted in this case, the Court will modify its previous construction to exclude "activation" from its prior construction this term.[4] However, in light of an express definition of the term in the specification, the Court is not persuaded to adopt plaintiff's proposed construction. Alexsam's proposed inclusion of the phrase "other functions depending on the card type or transaction" makes the claim term much broader than '608 patent specification would allow. The Court, therefore, construes the term "processing hub" as "a computer which provides front-end POS device management and message processing for card authorizations."

---

[4] The asserted patent claims in the *Datastream* case included claims such as Claim 1 and 9 of the '608 patent, that include an "activation" means. *See* Datastream Markman Order, at 10 (construing the term "activating an account").

## VI. Conclusion

The court adopts the constructions set forth in this opinion for the disputed terms of the patents. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the court.

SIGNED this 28th day of August, 2009.

*T. John Ward*
T. JOHN WARD
UNITED STATES DISTRICT JUDGE